[Cite as *State v. Hecox*, 2022-Ohio-2325.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## VAN WERT COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                 CASE NO.  15-21-09

    v.

DAVID CRAWFORD HECOX,             O P I N I O N

    DEFENDANT-APPELLANT.

**Appeal from Van Wert County Common Pleas Court**
**Trial Court No. CR-20-07-095**

**Judgment Affirmed**

**Date of Decision:  July 5, 2022**

APPEARANCES:

    *Gene P. Murray* **for Appellant**

    *Claire L. White* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, David C. Hecox ("Hecox"), brings this appeal from the September 23, 2021, judgment of the Van Wert County Common Pleas Court sentencing him to serve an indefinite prison term of 7 to 10 ½ years after Hecox was convicted in a jury trial of felonious assault in violation of R.C. 2903.11(A)(2), a second degree felony. On appeal, Hecox argues that he received ineffective assistance of trial counsel, and that the trial court erred by overruling his motion for a mistrial.

*Background*

{¶2} On July 2, 2020, Hecox was indicted for attempted (felony) murder in violation of R.C. 2923.02 and 2903.02(B), a first degree felony, attempted murder in violation of R.C. 2923.02 and 2903.02(A), a first degree felony, and felonious assault in violation of R.C. 2903.11(A), a second degree felony. The charges stemmed from an incident wherein Hecox stabbed a man in the neck, resulting in life-threatening injuries. Hecox pled not guilty to the charges.

{¶3} Prior to trial, Hecox moved to dismiss the attempted felony murder charge pursuant to *State v. Nolan*, 141 Ohio St.3d 454, 2014-Ohio-4800, wherein the Supreme Court of Ohio determined that "[a]ttempted felony murder is not a cognizable crime in Ohio." Based on *Nolan*, the trial court granted Hecox's motion.

{¶4} On August 9-10, 2021, Hecox's case proceeded to a jury trial. Testimony at trial established that on the evening of June 22, 2020, Hecox went to the Old South Tavern in Van Wert. Hecox lived in Illinois but he was in the Van Wert area for work. His employment involved escorting oversized equipment, such as windmills.

{¶5} On the evening in question, J.D. was also at the Old South Tavern along with several of his friends. J.D. indicated he had been drinking prior to going to the tavern and he had a "buzz" going in. (Tr. at 176). J.D. did not know Hecox prior to that evening but they engaged in a conversation at the bar. When the bar was closing, J.D. invited his friends and Hecox back to his residence to "hang out" and "play cards." (*Id*. at 178).

{¶6} Hecox and several other individuals went back to J.D.'s residence and continued drinking and "hanging out." (*Id*. at 179). At one point, Hecox started making "racist remarks," including "saying the N word quite a bit" and J.D. asked Hecox to stop. (*Id*. at 179-180). One of the individuals present was bi-racial, and Hecox was asked to leave after he continued to make racially insensitive comments.

{¶7} According to several individuals present at J.D.'s residence, one of whom was sober, Hecox eventually left the interior of the residence as requested, but he stayed outside and was "hollering and yelling." (Tr. at 182). When J.D.

became aware that Hecox had not left the property entirely, J.D. went outside to tell Hecox to go home because J.D. did not want the police to be called.

{¶8} J.D. testified that he was barefoot, standing on the steps to the residence and telling Hecox to go home when he Hecox moved like he was going to punch J.D. In response, J.D. put his hand up to block the punch, but it did not "feel right." (Tr. at 186). J.D. testified that he asked Hecox what he had done and Hecox "got a big old smile on his face and he said, I just stabbed you in the throat." (*Id.*)

{¶9} J.D. stumbled inside the residence and 911 was called. Paramedics arrived and J.D. was taken to the hospital and treated for life-threatening injuries. There was a four-to-five inch long, one inch wide, laceration on J.D.'s neck. There was also a cut on J.D.'s hand that caused him issues even up to the trial date.

{¶10} Following the stabbing incident, Hecox fled the scene and went back to his hotel. Officers located Hecox at work several hours after the incident, finding Hecox in his van with what looked to be blood droplets in various areas. A shirt was located in Hecox's van that had a bloody handprint on it. The blood was tested for DNA and found to be consistent with J.D.'s. A knife was also located on Hecox.

{¶11} Hecox testified on his own behalf at trial, claiming that he was only acting in self-defense when he stabbed J.D. Hecox introduced evidence at trial that

J.D.'s blood-alcohol level was .35 when J.D. was in the hospital after the stabbing, and that J.D. also had marijuana in his system.[1]

{¶12} As to the events leading up to the stabbing, Hecox's testimony was largely consistent with the other witnesses. He indicated he met J.D. and his friends at the bar and that J.D. asked everyone to come back to his house when the bar closed. While people were at J.D.'s residence, Hecox acknowledged making insensitive racial remarks and being asked to leave. However, Hecox testified that he was all the way outside of the residence and at his van when J.D. approached him. He testified that he did not see J.D. with any weapons, but J.D. pushed Hecox against his van. In response, Hecox testified that he pulled out his knife and that he and J.D. then struggled for the knife. Hecox testified that once he got the knife free from J.D., he stabbed J.D. with it.

{¶13} Photographs of Hecox taken after his arrest were introduced into evidence, showing some marks on his neck. Hecox testified he did not know when he got the injuries to his neck.

{¶14} The State contested Hecox's version of events by emphasizing that there was no blood found near where Hecox's van was parked, which was 75-80 feet away from the porch; rather, the blood was all closer to the area where J.D. had

---

[1] The evidence indicated that J.D. also had benzodiazepines in his system, but J.D. testified that those were administered by the hospital. As to the alcohol level in his blood, J.D. testified that at the time of the incident he struggled with alcohol issues.

stated the incident occurred near the residence. Further, the State emphasized that there was no indication that J.D. had any weapons when he went outside to tell Hecox to leave the property.

{¶15} The jury was instructed on self-defense, and the State's burden under the current statute to establish beyond a reasonable doubt that Hecox was not acting in self-defense. Ultimately the jury acquitted Hecox of attempted murder, but he was convicted of felonious assault in violation of R.C. 2903.11(A)(2).

{¶16} On September 22, 2021, Hecox's was sentenced to serve an indefinite prison term of 7 to 10 ½ years. A judgment entry memorializing his sentence was filed the next day. It is from this judgment that Hecox appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**

**A member of the jury went to high school with the Chief Detective in the case, and was a friend of the Chief Detective in the case, and his children were coached at their high school by the Chief Detective in the case, and last but certainly not least, the juror admitted to the trial court, of having a bias in favor of the Chief Detective in the case. Wherefore, the failure of defense counsel to strike the juror with an available peremptory challenge, did constitute ineffective assistance of counsel, in violation of the Sixth Amendment to the Constitution of the United States, applicable to the states through the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States, and by Article I, Section 10 of the Constitution of the State of Ohio.**

**Assignment of Error No. 2**

**In the State's case-in-chief, the jury was literally told that the defendant-appellant was advised of his <u>Miranda</u> rights, and the trial court erred by overruling the defendant-appellant's motion**

**for a mistrial for same, in violation of the fundamental and substantial right to remain silent, and in violation of the fundamental and substantial right to counsel, as guaranteed to the defendant-appellant by the Fifth and Sixth Amendments to the Constitution of the United States, applicable to the states through the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States, and also guaranteed by Article I, Section 10 of the Constitution of the State of Ohio.**

**Assignment of Error No. 3**
**By not requesting nor otherwise motioning for a jury instruction for the lesser offense of Aggravated Assault, to Count 3 of the indictment, which was Felonious Assault, after the groundwork for same was established by the defense: Trial Counsel was ineffective in representing and assisting the defendant-appellant, in violation of the Sixth Amendment to the Constitution of the United States, applicable to the states through the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States, and by Article I, Section 10 of the Constitution of the State of Ohio.**

*First Assignment of Error*

{¶17} In his first assignment of error, Hecox argues that his trial counsel was ineffective for failing to use a peremptory challenge on a juror who, he claims, expressed bias in favor of the detective in this case.

Standard of Review

{¶18} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or

unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689; *State v. Harris*, 3d Dist. Allen No. 1-21-30, 2021-Ohio-4559, ¶ 6.

{¶19} Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance of counsel. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141 (1989).

{¶20} To show prejudice under *Strickland* in the context of counsel's failure to strike a juror, Hecox "'*must* show that [a] juror was *actually biased* against him.'" (Emphasis added in *Mundt.*) *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio- 4836, ¶ 67, quoting *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir.2001). "Actual bias is 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Torres*, 128 F.3d 38, 43 (2d Cir.1997), citing *United States v. Wood*, 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936). "In sum, [Hecox] must prove that at least one of the jurors at his trial, because of the juror's partiality or biases, was not 'capable and willing to

decide the case solely on the evidence' before that juror." *State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, ¶ 24, quoting *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940 (1982).

**{¶21}** Actual bias can be found from a juror's express admission or from circumstantial evidence of the juror's biased attitudes. *Bates* at ¶ 25. For example, courts have found actual bias when a juror unequivocally stated that she could not be fair due to law-enforcement bias, *Hughes v. United States*, 258 F.3d 453, 459-460, when a juror had a fixed opinion of the defendant's guilt based on pretrial publicity, *Irvin v. Dowd*, 366 U.S. 717, 727-728, 81 S.Ct. 1639 (1961), or when a juror expressed views on the death penalty that "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S.Ct. 2222 (1992), quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521 (1980); *Bates* at ¶ 25.

Analysis

**{¶22}** In order to review Hecox's claim that his counsel was ineffective for failing to use a peremptory challenge to remove Juror 12—the juror he contends was biased—we will review all of the statements made by Juror 12 during voir dire. The first notable interaction with Juror 12 occurred while the trial court was asking preliminary questions to the potential jurors.

**THE COURT:  * * * Do you know or are you related to any of the parties to this action or to any of the attorneys who represent them?  Go ahead, sir, and speak loudly, please.**

**JUROR 12:  I know [Detective] Corey Reindel.  I graduated with him.**

**THE COURT:  So you went to high school with Corey?**

**JUROR 12:  Correct**

**THE COURT:  Er, Detective Reindel.  And the fact that you went to high school with him, would that make him a more credible witness or would you be able to evaluate him as you would any other witness?**

**JUROR 12:  All things equal, I would probably bear to his side.**

**THE COURT:  So you feel that you might have a bias for Corey?**

**JUROR 12:  Yes**

**THE COURT:  Because you have a positive feel…**

**JUROR 12:  Yes**

**THE COURT:  Ok.**

**JUROR 12:  He coached my kids as well.**

**THE COURT:  He coached your kids as well?**

**JUROR 12:  He's coached them in the past.**

**THE COURT:  Ok. You know, I didn't ask you, sir, what is your number?**

**JUROR 12:  I'm number 12.**

**THE COURT:  You're number 12?  So, you're [S.A.]?**

**JUROR 12: Yes**

(Tr. at 55-56).

**{¶23}** Immediately following this direct dialogue with Juror 12, the trial court addressed the jurors collectively regarding the jurors' ability to apply the law as instructed and render a fair and impartial decision.

> **THE COURT: * * * All right, thank you [S.A.].**
>
> **The court will instruct you concerning the law as it applies in this case. Is there anyone who cannot accept the law as explained to you by the Court and apply it to the facts as you find them to be in this case? (No response)**
>
> **The Court will instruct you as to the degree of proof required to prove the issues in this case. Is there anyone of you who cannot follow the instructions of the Court in that respect? (No response)**
>
> **Is there anyone here who cannot base your verdict solely upon the facts as testified to by the witness, the exhibits that are admitted into evidence and the law as given to you by the Court? (No response)**
>
> **Is there any reason why any of you cannot serve on this jury and render a fair and impartial decision when the case is finally submitted to the jury? (No response)**

(Tr. at 56-57).

**{¶24}** Once the trial court was finished with its preliminary questions to the potential jurors, the State proceeded to question the jurors. The State's only direct interaction with Juror 12 during voir dire was a brief conversation specifically about Juror 12's employment and the fact that he worked at the same place as other

members of the jury. Juror 12 was asked whether being on the jury with coworkers would impact his ability to be impartial and Juror 12 indicated that it would not.

{¶25} Juror 12 was next directly engaged during the defense's voir dire in the following dialogue.

> **[DEFENSE COUNSEL]: You know the detective. You said that you would give him more credence because he's a detective?**
>
> **JUROR 12: No, Just because I know him personally. So…**
>
> **[DEFENSE COUNSEL]: Oh, because you know him personally. OK.**
>
> **JUROR 12: Naturally I know him personally so I have, whatever he would state, I would probably give credence to.**
>
> **[DEFENSE COUNSEL]: OK.**
>
> **JUROR 12: Wouldn't make me biased. It wouldn't change against anything else anybody else says (INAUDIBLE)**
>
> **[DEFENSE COUNSEL]: I'm sorry?**
>
> **JUROR 12: It wouldn't change my opinion on any other witnesses or anything like that.**
>
> **[DEFENSE COUNSEL]: Right. You just, from your past experience you'd (INAUDIBLE) wasn't giving me a line or hooey?**
>
> **JUROR 12: What's that? I'm sorry?**
>
> **[DEFENSE COUNSEL]: You'd assume that he was pretty straight shooting?**
>
> **JUROR 12: Correct.**

**[DEFENSE COUNSEL]: OK. If errors or omissions, things were messed up or missed, you wouldn't assume that everybody's perfect?**

**JUROR 12: Correct.**

**[DEFENSE COUNSEL]: OK. So you might have your own independent view of what a set of things mean, you're not just going to defer to what he thinks?**

**JUROR 12: Correct**

**[DEFENSE COUNSEL]: OK. All right, what are your thoughts on what everybody else has been talking about?**

**JUROR 12: You have a Second Amendment right. I think that you have a right to bear arms. There's a responsibility that comes with it, just like driving a vehicle, so, you know….**

**[DEFENSE COUNSEL]: OK.**

**JUROR 12: … you have to do it responsibly and if you don't do it responsibly, there's consequences of it. With regards to following the law, there's a standard that's set, so, if you didn't have a standard, then it's just going to be chaos, so I think that whatever the standard is, you have to follow it. That's what, I believe is set as of today, so.**

**[DEFENSE COUNSEL]: How it's been set as of today.**

**JUROR 12: As of today, yes. Now, law could change.**

**[DEFENSE COUNSEL]: Right**

**JUROR 12: Things could change.**

**[DEFENSE COUNSEL]: All right, and you're OK with swearing an oath to do, in fact, that, because you've actually heard of that?**

**JUROR 12: Absolutely, yep**

**[DEFENSE COUNSEL]: Ok. Thank you, sir.**

(Tr. at 134-136).

{¶26} Following voir dire, defense counsel had peremptory challenges available so that he could have excused Juror 12, but defense counsel did not excuse Juror 12. Juror 12 was ultimately included on the jury. Hecox contends on appeal that his trial counsel was ineffective for failing to have Juror 12 removed from the jury through a peremptory challenge after Juror 12 indicated he would be "biased" in favor of the lead detective.

{¶27} Notably, although Juror 12 did initially indicate that he knew Detective Reindel and that he "would probably bear to his side," the trial court subsequently addressed all of the jurors and asked if they could be fair and impartial. Juror 12 did not indicate that he would be anything other than fair and impartial at that time.

{¶28} More importantly, however, when defense counsel questioned Juror 12, the juror affirmatively indicated that he would not just "defer" to what the detective thought, and he would keep his own view on things. He specifically stated he would not be "biased" and his thoughts regarding knowing Detective Reindel would not change his opinion on the testimony of other witnesses.

{¶29} Thus when voir dire is analyzed as a whole, we cannot find that the record definitively establishes that Juror 12 was biased in this matter. This case is

wholly unlike *State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, wherein a juror in a capital case expressed her view in a questionnaire that "Blacks" as a group were more violent than other races, and that she did not feel comfortable around black people. In that case, the Supreme Court of Ohio determined that the juror's silence in response to a group question about fairness was not sufficient to provide an assurance of impartiality, particularly where defense counsel did not inquire into the expressed bias or strike the juror.[2]  *Bates* at ¶ 37.

{¶30} Here, unlike *Bates*, Juror 12 was directly questioned by defense counsel and Juror 12 indicated that he would not just defer to what the detective thought.  *See State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, ¶ 81 (distinguishing *Bates* where, *inter alia*, defense counsel did question juror about potential bias).  This case is more akin to *State v. Barron*, 12th Dist. Warren No. CA2020-12-088, 2022-Ohio-102, wherein a juror initially expressed that he had some inherent bias in favor of prosecution and law enforcement, but the juror later indicated that he felt he would evaluate the evidence fairly and impartially. The Twelfth District Court of Appeals determined that in those circumstances, because the juror indicated that he understood his role as a juror, the presumption of innocence, and the State's burden of proof, the juror was successfully rehabilitated.

---

[2] *Bates* is the primary case relied upon by Hecox in his brief.

In this case, Juror 12 was similarly rehabilitated through group questions by the trial court and individual questions by defense counsel.

**{¶31}** Finally, separate from Juror 12's rehabilitation, we would note that defense counsel questioned the potential jurors about the Second Amendment and their feelings on it in an attempt, presumably, to see how the jurors felt about the use of weapons in self-defense.[3] Given Juror 12's favorable responses regarding the Second Amendment and certain limitations to it, defense counsel may have wanted Juror 12 on the jury. Few decisions at trial are as subjective or prone to individual attorney strategy as juror voir dire," and thus juror selection.[4] *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, ¶ 64; *State v. Ford*, 12th Dist. Madison No. CA2019-10-027, 2021-Ohio-782, ¶ 16.

**{¶32}** While defense counsel could have excused Juror 12, or at least further clarified Juror 12's position, we cannot find deficient performance by counsel in this matter particularly given that Hecox was acquitted of the most serious charge against him. However, even if we determined that counsel was ineffective for failing to have Juror 12 removed by peremptory challenge, we cannot find a

---

[3] During voir dire, the trial court restricted defense counsel from using "hypothetical" situations when questioning the jurors. At one point, the trial court held a sidebar and indicated that defense counsel was using improper hypotheticals by bringing up firearms. Defense counsel apparently indicated that he was just touching on the use of weapons in self-defense (it was inaudible in the transcript) and the trial court stated that if defense counsel would have "used a knife" in the questions rather than guns or bullets, the court "would have jumped all over you." (Tr. at 131).

[4] It is worth noting that many of the other prospective jurors had personal ties to law enforcement. Jurors 2 and 8, who were seated on the jury, were related to officers in other counties. In addition, Juror 6, who was also seated on the jury, was married to someone who worked for the Allen County Prosecutors office. Other potential jurors who were not seated also had ties to law enforcement such as Jurors 33, 36, 38, and 41.

reasonable probability that the result would have been different but for counsel's error given that the jury had to either believe J.D.'s story and disbelieve Hecox's story, or vice versa. J.D.'s story was supported in part by other witnesses, and his story was supported by the blood evidence. Thus we do not find that the second prong of ineffective assistance of counsel was met here, notwithstanding any concerns regarding the first prong of *Strickland*. For all of these reasons, Hecox's first assignment of error is overruled.

### *Second Assignment of Error*

{¶33} In his second assignment of error, Hecox argues that the trial court erred by overruling his motion for a mistrial. More specifically, Hecox contends that Detective Reindel improperly mentioned in his testimony that Hecox exercised his right to remain silent.

### Standard of review

{¶34} "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118 (1991). In general, the denial of a mistrial rests in a trial court's sound discretion and should not be disturbed on appeal absent an abuse of that discretion. *State v. Treesh*, 90 Ohio St.3d 460, 480 (2001).

### Analysis

{¶35} Detective Reindel testified to his involvement in this case, including locating Hecox at work several hours after the stabbing incident occurred. Detective Reindel testified that he saw Hecox in his vehicle at the job site, he approached Hecox, and asked Hecox to roll down his window. The following dialogue then occurred at trial.

> **[PROSECUTOR]: OK. He rolled down his window. You identified yourself, what did you next tell him?**
>
> **DET. REINDEL: I advised Mr. Hecox that, I didn't know his name at the time, but I advised him that I was investigating an incident that had begun at the Old South. Mr. Hecox told me that he was playing pool at the Old South from about eight to eleven, which again raised my suspicion with him matching the description, being in the location that we're looking at, so I began to examine the vehicle further and I noticed at that time that there were blood smears, or what appeared to be blood smears on the charging cord to his cell phone as well as the gear shift. I could notice the same red speckles that we saw on the photos before on the black pants that he had, that were consistent with dried blood. He also had a buck knife, or a clip knife, in his right front pocket, which again, kind of all raised my suspicion at this point.**
>
> **So I asked Mr. Hecox to step out of the vehicle, which he did. He provided his identification. That's when we learned his identity was David Hecox. I asked him to step to the rear of the vehicle with Deputy Thornell. I advised him of his Miranda rights, based on all of the things that I had seen in the car. I then asked him, I told Mr. Hecox that I was investigating a stabbing that occurred just a few hours ago and at that point, Mr. Hecox exercised his right to …**
>
> **[DEFENSE COUNSEL]: Objection**
>
> **DET. REINDEL: … remain silent. And I was unable to ask him any more questions.**

**DEFENSE COUNSEL]:  Objection**

**THE COURT:  Sidebar.**

(Tr. at 332-34).

{¶36} A sidebar was held outside of the hearing of the jury wherein defense counsel stressed that the mention of Hecox exercising his right to remain silent was erroneous.  Defense counsel then requested a mistrial, but stated at minimum there needed to be a curative instruction given to the jury.

{¶37} The trial court permitted defense counsel to argue his objection and his motion for a mistrial.  Defense counsel emphasized that a veteran detective and a veteran prosecutor should know better than to provide such testimony regarding the defendant exercising his right to remain silent.  The State responded by arguing that the detective was not particularly responsive to the State's question.  Further, the State argued that Hecox exercising his right to remain silent would not be emphasized by the State and that it should not rise to the level of a mistrial.

{¶38} Ultimately the trial court found that a fair trial was still possible, thus the motion for a mistrial was denied.  However, the trial court did provide a curative instruction to the jury, which reads as follows:

> **THE COURT:  Ladies and gentlemen, before we begin any further questioning after this break, I want to make you aware that a defendant has a Fifth Amendment right to silence and a Sixth Amendment right to seek and have counsel before making any statement.  And the fact that someone exercises their Fifth**

**Amendment right individually or while waiting for their Sixth Amendment right is not something that you should consider in your deliberations and therefore, I would ask you to disregard any comments about the defendant possibly using his Fifth Amendment right. Thank you very much.**

(Tr. at 344-345).

{¶39} Hecox now argues on appeal that the trial court erred by overruling his motion for a mistrial because his Fifth Amendment rights were violated through Detective Reindel's testimony.

{¶40} It is undisputed that generally, comments or testimony regarding a defendant exercising his right to remain silent are erroneous. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577. However, as stated previously, a mistrial is only warranted where a defendant can no longer receive a fair trial. *State v. Franklin*, 62 Ohio St.3d 118 (1991).

{¶41} In this case, the trial was stopped immediately after the erroneous testimony was introduced. After discussing the issue with the parties, the trial court provided the jury with strict and explicit instructions to disregard any mention of Hecox exercising his right to remain silent. A jury is presumed to follow the curative instructions of the trial court. *State v. Loza*, 71 Ohio St.3d 61 (1994). Thus for this reason alone we do not find that the trial court abused its discretion by denying Hecox's request for a mistrial.

{¶42} Moreover, notwithstanding the curative instruction, the Supreme Court of Ohio has held that, "[a] single comment by a police officer as to a suspect's silence without any suggestion that the jury infer guilt from the silence constitutes harmless error." *State v. Treesh,* 90 Ohio St.3d 460, 480, 2001–Ohio–4; *State v. Perkins*, 3d Dist. Hancock No. 5-13-01, 2014-Ohio-752, ¶ 50. It is our conclusion that this is precisely what occurred here.

{¶43} In sum, the trial court addressed the erroneous testimony by providing a curative instruction. Further, the single isolated comment of Detective Reindel was devoid of any suggestions that guilt should be inferred. As a result, we find the error was harmless in this matter. For these reasons, Hecox's second assignment of error is overruled.

### *Third Assignment of Error*

{¶44} In his third assignment of error, Hecox argues that his trial counsel was ineffective for failing to request a jury instruction on aggravated assault as an alternative to felonious assault.[5]

### Analysis

{¶45} In his brief, Hecox contends that his actions "perfectly fit" the elements of aggravated assault under R.C. 2903.12(A)(1), which reads, "No Person, while under the influence of sudden passion or in a sudden fit of rage, either of

---

[5] The standard of review for the third assignment of error is the same as the first assignment of error.

which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly * * * cause serious physical harm to another." Because of this alleged "perfect fit," Hecox contends that trial counsel was ineffective for failing to request an instruction on aggravated assault.

{¶46} Contrary to Hecox's claim on appeal, his trial counsel gave clear consideration of the issue of a potential jury instruction on aggravated assault both before and during the trial. In fact, the issue of a potential instruction on aggravated assault was discussed in pretrial briefing by both the State and defense counsel. *See* (Doc. Nos. 89, 94).

{¶47} More importantly, however, before the case was submitted to the jury, the trial court and the parties discussed the jury instructions that would be provided to the jury. At that time, defense counsel made the following statement.

> **[DEFENSE COUNSEL]: * * * Now, this is going to be somewhat complicated, but I think I can make it simple. There were three points originally, only one remaining, where the, in theory, the issue of the inferior degree offense [aggravated assault] could come up. It did not in direct testimony. In other words, the defense did not direct, in direct testimony, put forward sufficient evidence in the defense opinion, to warrant an instruction on the inferior degree offense [aggravated assault]. It was a self-defense claim with no claim of rage or sudden passion, sudden rage or sudden passion.**
>
> **The second point where it could have come up is during cross examination and as defense counsel, I didn't know how that was going to develop. And I would agree and I think implicit within**

-22-

**the instructions with the removal of that language, the Court's of the same opinion.**

**The third possibility, which I've, I want to maintain until the actual point of instruction, is that the State could, in theory, make an argument during initial or rebuttal close, that the inferences that the jury could draw from the testimony is that my client did not act in self-defense, but instead he was acting out of rage or passion. I would suggest that the Court remain open to the possibility that the defense at the very end, based upon a prosecution argument of inference, may open the door to the necessity to the present case.**

(Tr. at 453-544).

**{¶48}** In response to the defense, the trial court indicated that if the State attempted to argue a sudden passion or rage in closing, the trial court would consider an instruction on aggravated assault at that time. However, the State then did not make the argument in closing that Hecox acted in a sudden passion or rage, and thus defense counsel did not ultimately request an instruction on the inferior offense of aggravated assault.

**{¶49}** Despite clear consideration of whether to request an instruction on aggravated assault, Hecox argues now that it was error for defense counsel not to ultimately request an instruction on this issue.[6] However, from the inception of this case, it was clear that defense counsel was presenting this matter as one of self-

---

[6] Notably, Hecox does acknowledge that under *State v. Deem*, 40 Ohio St.3d 205, 208 (1998), aggravated assault is *not* a lesser included offense of felonious assault; rather, it is an "inferior degree." An offense is an "inferior degree" of the indicted offense where its elements are *identical* to or contained within the indicted offense, except for one or more additional mitigating elements which will generally be presented in the defendant's case. *Deem* at 209.

defense. Hecox testified as much in his case-in-chief, describing being pushed up against his van and struggling over the knife with J.D.

{¶50} If the jury had determined that the State had not proven beyond a reasonable doubt that Hecox was not acting in self-defense, Hecox would have been acquitted of all charges. An instruction on an *alternative* theory of the case might have undermined a steadfast self-defense claim. Such an issue clearly falls within the ambit of trial strategy and we do not find ineffective assistance of counsel simply because it was unsuccessful. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991).

{¶51} In fact, the Supreme Court of Ohio has stated that the "[f]ailure to request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel," especially where, as here, the evidence does not support such an instruction. *State v. Griffie*, 74 Ohio St.3d 332, 333 (1996); *State v. McEndree*, 11th Dist. No. 2019-A-0038, 2020-Ohio-4526, ¶ 86.

{¶52} At the close of evidence in this case, the trial court questioned whether the record warranted an instruction on aggravated assault, stating that it did not "believe there is evidence of sudden passion." (Tr. at 456). It is unclear from the trial court's brief analysis and conclusion exactly what led the trial court to its determination. It is possible that the trial court believed there was no evidence at all of "sudden passion" or it is possible that the trial court merely reasoned that any

potential evidence of "sudden passion" was not reasonably sufficient to incite the use of "deadly force." Regardless, upon review of the record, it is our conclusion that there was no evidence indicating Hecox was under the influence of sudden passion brought on by the victim *that was reasonably sufficient to incite the person into using deadly force*. This is because the evidence indicated that J.D. did not have a weapon when he confronted Hecox. There simply was no evidence to establish that Hecox, even if he was incited to some degree, was incited sufficiently to require the use of *deadly* force.

{¶53} Given that we can find no error with trial counsel's strategy, and given that we do not find that the evidence supported an instruction on aggravated assault regardless, we do not find that either prong of ineffective assistance of counsel is met here. For these reasons, Hecox's third assignment of error is overruled.

*Conclusion*

{¶54} For the foregoing reasons Hecox's assignments of error are overruled and the judgment of the Van Wert County Common Pleas Court is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and MILLER, J., concur.**

**/jlr**